IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>ANTONIO ZALDIVAR,<br><br>Defendant. | ORDER<br><br>AND<br><br>MEMORANDUM DECISION<br><br>Case No. 2:06-CR-672 TC |

Defendant Antonio Zaldivar has been indicted on eight counts of violating drug

trafficking and firearm laws.  He filed a motion to suppress evidence[1] obtained by the

government during a warrant-based search of 5945 West Maren Place, West Jordan, Utah.  Mr.

Zaldivar contends that the search warrant was obtained under false pretenses and did not

establish probable cause to search the house.  He also seeks to suppress a photograph obtained

during a warrantless search of a digital camera found during police inventory of a seized car.

Finally, he contends that officers did not have probable cause to arrest him without a warrant

during an attempted controlled delivery of cocaine and methamphetamine.[2]

For the reasons set forth below, the court finds that the search of the house, under the

---

[1]See Second Amended Motion to Suppress for Illegal Search and Seizure and for Miranda Violation (Dkt # 46) (as supplemented by Notice of Clarification in re: Standing (Dkt # 47)).

[2]Mr. Zaldivar also filed a motion to suppress his post-arrest statements based on, among other things, the government's alleged failure to properly administer a Miranda warning.  He has since withdrawn that claim.  (See Def.'s Mem. Supp. Mot. Suppress at 13.)  Accordingly, the court will not address it.

good faith exception of <u>United States v. Leon</u>, 468 U.S. 897 (1984), was valid.  Further, the court

finds that Mr. Zaldivar does not have standing to challenge the search of the camera that

generated the photo he seeks to suppress.  Lastly, the court finds that, given the facts leading up

to the arrest and reasonable inferences drawn from those facts, the government had probable

cause to arrest Mr. Zaldivar.  Accordingly, Mr. Zaldivar's motion to suppress is DENIED.

**FINDINGS OF FACT**[3]

On September 17, 2006, Trooper Matt Moonin of the Nevada Highway Patrol conducted

a traffic stop of a Volkswagen Passat driven by Carlos Guzman-Obando, a co-defendant in this

case.  Mr. Guzman-Obando, the only one in the car, gave permission to the trooper to search the

Passat.  The trooper found approximately ten pounds of cocaine and six pounds of

methamphetamine hidden in the gas tank.  Mr. Guzman-Obando agreed to assist law enforcement

personnel (including agents of the Drug Enforcement Administration (DEA)) with a controlled

delivery of the illegal drugs.  During the controlled delivery, he would deliver the drugs in Salt

Lake City as planned, but under DEA surveillance.

Mr. Guzman-Obando told the agents where he was to deliver the drugs: 5945 West

Maren Place, West Jordan, Utah.  Although Mr. Guzman-Obando's statement of the address was

off by two numbers, he gave an accurate and detailed physical description of house, for which he

was listed as the lessee (this information was verified by law enforcement agents).  He said he

knew what the house looked like because he had made another delivery of drugs to the people at

the house just three days earlier.

---

[3]The facts are taken from the transcripts of two evidentiary hearings held on January 9,
2007, and February 28, 2007.

Mr. Guzman-Obando described the earlier delivery to officers.  He said that he had brought a similar amount of cocaine and methamphetamine, stowed in the Passat's gas tank, from California to the Maren Place house (agents obtained an address in California for a Carlos O. Guzman).  He called his contacts (Neto and Chewy, who, according to Mr. Guzman-Obando were staying at the house) to let them know he had arrived.  His contacts met him outside in front of the house.  They got into the car containing the drugs and drove him in that car to a hotel. After they dropped him off at the hotel (where he spent the night), they took his car, and then returned it the next day at the hotel.  At that point, Mr. Guzman-Obando apparently drove back to California.  He never took the drugs into the house or the hotel.  He did not see Neto or Chewy take the drugs out of the gas tank, into the hotel, or into the house.  But Neto and Chewy took possession of the car containing the drugs and returned it empty.

Mr. Guzman-Obando also said the two men at the house were involved in a drug distribution operation in the Salt Lake Valley and were expecting another delivery (of drugs transported in the gas tank) from him (the one he would have completed if he had not been caught in Nevada).

DEA agents began watching the house.  During their surveillance, they watched a Toyota Echo leave the garage of the Maren Place house.  The agents were not able to identify who was driving the Echo.  According to Special Agent Marsee, the officers "followed [the Toyota Echo] to some spots [in West Valley, Utah], and it was just meeting up with people and then it drove back [to the Maren Place house and into the garage]."  (Transcript of Jan. 9, 2007 Evidentiary Hearing (hereinafter "Jan. Tr.") at 45.)  He testified that the agents characterized these stops as "possibly" "drug deal[s]."  (Id. at 45.)

3

Based on information from Mr. Guzman-Obando and details independently observed and verified by the agents, DEA Special Agent Robert Marsee obtained a search warrant for the Maren Place house.  (See Exs. 1 and 2.)  Before the agents searched the house, they set up the controlled delivery.

They arranged with Mr. Guzman-Obando to conduct the controlled delivery later in the evening of September 18, 2006.  They arranged for Mr. Guzman-Obando to park the Passat in the parking lot of a grocery store (Albertson's) a few miles from the Maren Place house.  They decided to do the controlled delivery away from the house to ensure that agents (who were concerned about possible weapons at the house) had "total control of the situation" and could better identify the individuals involved.  (Jan. Tr. at 21-22, 64.)  The agents disabled the Passat so it would not start.  Then Mr. Guzman-Obando, at the agents' instruction, called his delivery contacts to let them know he was having car trouble and to come get him.  Mr. Guzman-Obando wore a wire that monitored his conversations.

Shortly after Mr. Guzman-Obando placed the call, agents watching the Maren Place house saw a gray Chevrolet Tahoe SUV emerge from the house's garage.  They followed the Tahoe to the Albertson's parking lot, where the Tahoe parked by the Passat.  Two men got out of the Tahoe and began speaking to Mr. Guzman-Obando in Spanish.  The conversation was recorded, but because it was in Spanish, Special Agent Marsee (who ordered the arrests) relied on an interpreter's summary.

The men began discussing and examining the Passat.  The two men expressed great interest in the car and one of the men noted that the problem must be in the gas tank.  According to a paraphrase of the interpreter's summary by Special Agent Marsee, the interpreter said

4

"They're interested in the gas tank.  They're interested in the vehicle.  They're very interested in the vehicle.  They're really concerned about the vehicle."  (Jan. Tr. at 53.)

The two men examined the car in an apparent attempt to start it.  They rejected Mr. Guzman-Obando's suggestion that the car be towed.  Instead, they went to purchase tools at the Albertson's store, apparently to try to fix the car themselves.  At this point, Special Agent Marsee ordered that the men be arrested.

After the arrest, agents searched 5945 West Maren Place.  They also impounded the Tahoe.

Later, when Special Agent Marsee was conducting a standard inventory of the Tahoe, he found a digital camera.  He did not know who owned the camera, so he began viewing photographs in the camera to figure out to whom it belonged.  (Later, Mr. Zaldivar testified that his co-defendant Moya-Breton owned the camera.)  During Special Agent Marsee's review of the photographs, he came across an incriminating photo of Mr. Zaldivar.  Mr. Zaldivar seeks to have that photograph suppressed.

## CONCLUSIONS OF LAW

In his motion to suppress, Mr. Zaldivar challenges his arrest, the search of the house on Maren Place, and the seizure of the photograph.  The court will address each claim in turn.

1.      **The Officers Had Probable Cause For the Warrantless Arrest of Mr. Zaldivar**.

Mr. Zaldivar contends that the officers did not have probable cause to arrest him in the Albertson's parking lot on September 18, 2006.  He claims that he "was nothing more than a passenger who accompanied someone who was intending to help an acquaintance whose vehicle was broken down."  (Def.'s Mem. Supp. at 13.)

"[T]he Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense." Michigan v. DeFillippo, 443 U.S. 31, 36 (1979) (citations omitted). "Probable cause arises when there exist 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." United States v. Villagrana-Flores, 467 F.3d 1269, 1273-74 (10th Cir. 2006) (quoting Michigan v. DeFillippo, 443 U.S. at 37).

While probable cause requires more than mere suspicion, it does not require facts sufficient to support a finding of guilt. United States v. Soto, 375 F.3d 1219, 1222 (10th Cir. 2004). Rather, "probable cause requires only a probability or substantial chance of criminal activity[.]" Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983).

To determine whether probable cause exists, the court must look at the totality of the circumstances, reviewing the historical facts leading up to the arrest and the reasonable inferences to be drawn from those facts by an objective, trained officer. See Soto, 375 F.3d at 1233 (making probable cause determination based on totality of circumstances); Sparks, 291 F.3d at 688-89 (accepting "prudent, cautious and trained police officer" inferences that potentially innocent activity was more likely indication of criminal activity given the circumstances). See also Ornelas v. United States, 517 U.S. 690, 696 (1996) (noting "principal components of a determination of . . . probable cause [to search] will be the events which occurred leading up to the . . . search, and then the decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to . . . probable cause.").

At the time of arrest, the officers had knowledge of facts that, in combination, established

probable cause.  They had an informant (Mr. Guzman-Obando) whose credibility and reliability

had been sufficiently corroborated.[4]  He had been caught in Nevada transporting ten pounds of

cocaine and five pounds of methamphetamine in the gas tank of a Volkswagen Passat.  He said

he was delivering the drugs to 5945 West Maren Place, West Jordan, Utah.[5]  Mr. Guzman-

Obando also said he delivered illegal drugs (similarly stowed in his car's gas tank) to two men at

the Maren Place house three days earlier.  He said the two men were involved in a drug

distribution operation in the Salt Lake Valley and were expecting another delivery of drugs

(transported in the gas tank) from him (the one he would have completed if he had not been

caught in Nevada).

Before the controlled delivery began, officers observed what they characterized as

possible drug deals by the driver of a Toyota Echo that was parked in the garage of the Maren

_____

[4]Mr. Zaldivar complains that the investigating officers did not investigate the validity of
every verifiable detail Mr. Guzman-Obando gave them, and so, he argues, they cannot rely on the
informant's statements.  This seems like an unrealistic standard given the time crunch the
officers faced (they probably did not want to delay the delivery and cause suspicion at the
receiving end).  Moreover, the investigating officers did verify some material details.  For
example, the government agents interviewed Mr. Guzman-Obando face to face in Nevada for a
sufficiently long time, which allowed them to assess his credibility.  And details about the Maren
Place house were verified (the physical location, the physical description, the lease in Mr.
Guzman-Obando's name).  Some details were verified as the controlled delivery was occurring
(e.g., Mr. Guzman-Obando's call to a cell phone brought two occupants from the Maren Place to
the Albertson's parking lot).  The court finds that the officers reasonably relied on Mr. Guzman-
Obando's statements.

[5]Mr. Guzman-Obando, when he gave the address to officers, actually gave an address that
was two numbers off.  But his physical description of the place was consistent with what the
officers found at 5945 West Maren Place.  The address he gave did not actually exist.  This
mistake on the part of Mr. Guzman-Obando actually adds more credibility to his story that he did
not live at the house but only had it in his name.

Place house.  After the controlled delivery was arranged, Mr. Guzman-Obando placed a phone

call to his drug delivery contacts.  Just minutes after his call, a Chevrolet Tahoe SUV emerged

from the garage at the Maren Place house (as observed by officers conducting surveillance).

Officers followed that Tahoe to the Albertson's parking lot, where the driver of the Tahoe went

straight to Mr. Guzman-Obando's Volkswagen Passat.  Two men got out of the Tahoe and began

talking to Mr. Guzman-Obando.  The two men expressed great interest in the car and one of the

men noted that the problem must be in the gas tank.  They did not seem to want to relinquish

control of the car, because they rejected Mr. Guzman-Obando's suggestion that the car be towed

and they were planning on buying tools at the Albertson's store, apparently to try to fix the car

themselves.

As noted above, Mr. Zaldivar contends that his behavior could only be interpreted as

innocent under the circumstances.  Certainly "'nearness to the place of the arrest of a co-

conspirator or to the place of illegal activity' is not sufficient to establish probable cause."

United States v. Springfield, 196 F.3d 1180, 1183 (10th Cir. 1999).  But the court finds that the

officers could reasonably infer from all of the circumstances that he was participating in the

scheme to pick up the cocaine and methamphetamine from Mr. Guzman-Obando and distribute

the drugs.  See, e.g., United States v. Soto, 375 F.3d 1219, 1222-23 (10th Cir. 2004) (finding

probable cause to arrest individual who, according to officers, was engaging in counter-

surveillance near drug deal between suspect and undercover officer);  United States v. Sparks,

291 F.3d 683, 688-89 (10th Cir. 2002) (noting that although defendant's actions of picking up an

unmarked bag of methamphetamine from the side of the road "could theoretically have been

innocent, we believe a prudent, cautious and trained police officer more likely would have

construed those actions as indicating [that the defendant] was familiar with and had some connection to the original bag containing methamphetamine.").

This case is similar to United States v. Strickland, 144 F.3d 412 (6th Cir. 1998), in which the court found the officers had probable cause to arrest the defendant without a warrant. In Strickland, the court addressed the issue of whether there was probable cause for arrest of a suspected drug dealer when "police officers rel[ied] solely on the statements of an informant as to the manner in which the planned drug deal would take place and on certain occurrences the officers observe[d] at the time and place of the planned drug deal that appear[ed] to corroborate the informant's statements." Id. at 413-14.

The defendant Strickland was arrested after he met up with the police informant Haggard (who was wearing a wire and was set up with cash to buy the drugs). Strickland got into Haggard's car, talked for a few minutes, got out of Haggard's car, and began walking back to his car. The arresting detectives were not listening to the conversation and were waiting for a signal from another officer that the drug deal had been consummated. As Strickland appeared to be leaving the scene, even though the arresting detectives did not receive the proper signal, they arrested him. But the drugs and money had not changed hands.

The Strickland court found probable cause for the arrest. The court noted that "the corroboration of a certain amount of information provided by an informant can be sufficient to establish probable cause to arrest and search a criminal suspect." Id. at 417. It then held that, despite the fact that the officers did not actually witness any illegality, they had probable cause based on "two taped telephone calls between Haggard and his brother-in-law in which Haggard's brother-in-law mentioned Strickland as a source of cocaine; one telephone call between

Strickland and Haggard, one side of which was heard [by a detective]; Haggard's description of

the time, location, and manner of the scheduled drug transaction; and Strickland's arrival at the

appointed place and time." Id. at 415.

Here, Mr. Guzman-Obando's statements to the investigators plus what officers observed

and overheard before and during the controlled delivery sufficiently linked the two men in the

Tahoe to criminal activity. As noted above, "probable cause requires only a probability or

substantial chance of criminal activity[.]" Illinois v. Gates, 462 U.S. 213, 243 n.13 (1983). The

court finds that a probability or substantial chance of criminal activity by the two men was

established when the totality of the circumstances is evaluated.

**2.      Validity of Search Warrant and Search of House**

     a.      Defendant's Request that Portion of Affidavit Be Stricken is Not Supported Under
          *Franks*.

Mr. Zaldivar claims that the search warrant used by the officers to search the Maren Place

house was obtained under false pretenses and did not establish probable cause to search the

house.[6] As part of his claim, and based on testimony heard during the court's January 2007

---

[6]Mr. Zaldivar contends that the search warrant was an anticipatory search warrant. One
of the testifying officers also referred to it as an anticipatory warrant (plus the supporting
affidavit is titled "Affidavit in Support of the Application for an Anticipatory Search Warrant").
(See Jan. 2007 Tr. at 19; Ex. 2.) Both are incorrect. "An anticipatory warrant is 'a warrant based
upon an affidavit showing probable cause that at some future time (but not presently) certain
evidence of crime will be located at a specific place. Most anticipatory warrants subject their
execution to some condition precedent other than the mere passage of time—a so-called
'triggering condition.'" United States v. Grubbs, 547 U.S. 90, 126 S. Ct. 1494, 1498 (2006)
(internal citation omitted). Here, there is no future time or triggering condition mentioned in the
warrant or affidavit. And the use of present-tense, rather than future tense, language in the
warrant indicates the non-anticipatory nature of the warrant. Plus the portion of the affidavit
relied upon by the government to establish probable cause describes only facts and circumstances
in existence at the time the warrant was issued. As the government noted, "Indeed, it would have

evidentiary hearing, Mr. Zaldivar filed a Motion for a <u>Franks</u> Hearing, seeking to strike a portion

of the supporting affidavit.

Under <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), a defendant can attack the validity of a

search warrant by alleging that it contains false or materially misleading statements.  Under

<u>Franks</u>, a hearing on the veracity of an affidavit supporting a warrant is required if the defendant

makes a substantial showing that the affidavit contains intentional or reckless false statements

and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable

cause.  <u>Franks</u>, 438 U.S. at 155–56; <u>see also</u> <u>United States v. Kennedy</u>, 131 F.3d 1371, 1376

(10th Cir. 1997); <u>Stewart v. Donges</u>, 915 F.2d 572, 581–82 (10th Cir. 1990).  If the defendant

establishes at the hearing by a preponderance of the evidence that the false statement was

included by the affiant "knowingly and intentionally, or with reckless disregard for the truth,"

and the false statement was "necessary to the finding of probable cause," then the search warrant

must be voided and the fruits of the search excluded.  <u>Franks</u>, 438 U.S. at 155–56; <u>see also</u>

<u>Kennedy</u>, 131 F.3d at 1376; <u>Stewart</u>, 915 F.2d at 581. The Tenth Circuit has extended the <u>Franks</u>

analysis to "material omissions" as well as material falsehoods.  <u>See</u> <u>Stewart</u>, 915 F.2d at 582;

<u>United States v. McKissick</u>, 204 F.3d 1282, 1297 (10th Cir. 2000).

Mr. Zaldivar contends that Special Agent Marsee's affidavit contained a material

misrepresentation that misled the magistrate judge who issued the warrant.  That alleged material

---

defied common sense for [Special Agent] Marsee to have sought an actual anticipatory warrant
when the only future event to take place was a controlled delivery, which was to occur not at the
target residence but a grocery store parking lot.  In other words, the only future event anticipated
when the warrant was sought would not have produced evidence at the target location."  (U.S.
Response to Def.'s Mot. Suppress Evidence at 12.)

misrepresentation consisted of an omission regarding all the facts surrounding the earlier drug

delivery to the house on Maren Place.

Specifically, Mr. Zaldivar seeks to have the alleged misrepresentation—in the second

paragraph of page 17 of the affidavit—stricken.  That paragraph reads as follows:

> According to GUZMAN-OBANDO, he stated to agents that he had delivered
> approximately the same amount of cocaine and methamphetamine to 5945 West
> Maren Place, West Jordan, Utah, approximately one week earlier on Thursday,
> September 14, 2006.

(Aff. in Supp. of Application for Search Warrant at 17, Ex. 2 (emphasis added).)  According to

Mr. Zaldivar, "[i]mplicit in this representation was a claim that the controlled substances

[physically were carried] into the Maren Place residence."  (Def.'s Request for a Franks Hearing

(Dkt # 53) at 1.)  Mr. Zaldivar contends that Special Agent Marsee's language "was so

imprecise" that it amounted to a reckless disregard for the truth.

The details surrounding the September 14, 2006 drug delivery came out during the

January 2007 and February 2007 evidentiary hearings at which Special Agent Marsee (the

affiant) testified about the specifics underlying his statement in that second paragraph.

Apparently, Mr. Guzman-Obando drove the same amount of drugs, stashed in the gas tank of the

car, from California to Salt Lake City.  He drove to 5945 West Maren Place.  He called his

contacts (Neto and Chewy, who, according to Mr. Guzman-Obando were staying at the house) to

let them know he had arrived.  His contacts met him outside in front of the house.  They got into

the car containing the drugs and drove him in that car to a hotel, where he spent the night.  After

they dropped him off at the hotel, they took his car, and then returned it the next day at the hotel.

At that point, he apparently drove back to California.  Mr. Guzman-Obando never took the drugs

into the house or the hotel.  He did not see Neto or Chewy take the drugs out of the gas tank, into the hotel, or into the house.  But Neto and Chewy took possession of the car containing the drugs and returned it empty.

Mr. Zaldivar distinguishes between delivering drugs into the house and delivering drugs to the house.  But the court does not believe the distinction is material, and the omission of the hotel information does not amount to a material omission.  The car containing the drugs was taken to the house and dropped off.  The people staying at the house took possession of the car containing the drugs.  This information is consistent with the statement in the affidavit that Mr. Guzman-Obando "had delivered approximately the same amount of cocaine and methamphetamine to 5945 West Maren Place, West Jordan, Utah" three days before.  As the government notes, "[w]hat can be inferred from the 'delivered to' language in the affidavit is that the drugs were taken to the Maren Place residence and left in the possession of the people who lived there."  (U.S.'s Response to Def.'s Request for Franks Hearing at 5.)  There was no reckless disregard for the truth, and, accordingly, the court will not strike paragraph two of page seventeen of the affidavit.  Mr. Zaldivar's request under Franks is denied.

       b.      The Search of 5945 West Maren Place Was Valid.

            i.      Probable Cause

In assessing probable cause, an affidavit must be viewed under the "totality of circumstances" test adopted by the United States Supreme Court in Illinois v. Gates, 462 U.S. 213 (1983).  Probable cause "requires a nexus between suspected criminal activity and the place to be searched."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000) (internal quotation marks and citation omitted).  Specifically, a court must determine if the issuing court

made "a practical, common-sense decision whether, given all the circumstances set forth in the

affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a

particular place." Gates, 462 U.S. at 238.  The court must determine whether, under the totality

of the circumstances presented in the affidavit, the issuing judge had a substantial basis for

concluding that probable cause existed.  Id. at 238-39.  The judge's decision to issue a warrant is

entitled to great deference.  Id. at 236;  United States v. Glover, 104 F.3d 1570, 1577 (10th Cir.

1997).

        Mr. Zaldivar contends that the search warrant is not supported by probable cause if the

second paragraph of page seventeen of the affidavit is stricken.  Given the court's holding above,

that issue is moot.  But Mr. Zaldivar, relying on United States v. Danhauer, 229 F.3d 1002 (10th

Cir. 2000), also contends that the informant's reliability was not sufficiently established and so

that prevents a finding of probable cause.

        In Danhauer, the confidential informant was anonymous.  This case is different because

the identity of the informant (Mr. Guzman-Obando) was known, and he gave the agents

information face-to-face, allowing them to judge his credibility.  Also, some of the information

he provided was independently verified by the agents before they sought the search warrant (for

example, that the Maren Place house was listed in his name, and that Mr. Guzman-Obando's

detailed description of the residence was accurate).  Mr. Guzman-Obando was personally

involved in drug trafficking activity, the house to be searched was listed in his name, and he lived

in and was driving from California to the Maren Place house (the agents had a California address

for a Carlos O. Guzman, who was caught driving North on I-15 towards Salt Lake City).  Special

Agent Marsee did present a sworn statement and evidence that independently corroborated Mr.

14

Guzman-Obando's reliability and veracity.  The informant's reliability was sufficiently

established.

     In addition to Mr. Guzman-Obando's statements, including the description of a drug

delivery to occupants of the Maren Place house, the affidavit contained other information to

support probable cause.  For instance, the affiant, Special Agent Marsee, noted that, based on his

experience, drug stash houses are often listed in a different person's name to give anonymity to

the participants in the drug conspiracy.  And he testified that evidence of drug trafficking (e.g.,

drugs, currency, pay/owe records, drug paraphernalia, drug packaging materials, and firearms) is

typically found at such houses.  Special Agent Marsee's training, experience, and expert opinions

are relevant to the probable cause determination.  See, e.g., United States v. Glover, 104 F.3d

1570, 1578 (10th Cir. 1997) (citing United States v. Cook, 949 F.2d 289, 292-93 (10th Cir.

1991)).

     Also, on a more concrete level, surveillance of the house (before the controlled delivery

occurred) led trained and experienced officers to suspect that it was a "stash house."  Indeed,

Special Agent Marsee testified that officers, who were watching the house before the controlled

delivery took place, followed a Toyota Echo (parked in the house's garage) to periodic stops and

visits that were suspiciously consistent with illegal drug deals.

     Given the totality of the circumstances, the court finds that the affidavit provides

sufficient evidence to support the magistrate judge's finding of probable cause for issuance of the

warrant to search 5945 West Maren Place.  But even if the affidavit does not support a finding of

probable cause, the court finds that the search warrant (with or without the affidavit's second

paragraph of page seventeen) still survives under the good faith exception set forth in United

States v. Leon, 468 U.S. 897 (1984).

### ii.      <u>Leon</u> Good Faith Exception

The good faith exception to the warrant requirement, as articulated in <u>United States v.</u>

<u>Leon</u>, 468 U.S. 897 (1984), requires that evidence not be suppressed when the officer conducting

the search "act[s] in reasonable reliance on a search warrant issued by a detached and neutral

magistrate but ultimately found to be unsupported by probable cause." <u>Leon</u>, 468 U.S. at 900,

920-21.  The Supreme Court has stated that "[i]f the purpose of the exclusionary rule is to deter

unlawful police conduct, then evidence obtained from a search should be suppressed only if it

can be said that the law enforcement officer had knowledge, or may properly be charged with

knowledge, that the search was unconstitutional under the Fourth Amendment." <u>Id.</u> at 919.

In assessing the good faith exception, a court's inquiry "is confined to the objectively

ascertainable question whether a reasonably well trained officer would have known that the

search was illegal despite the magistrate's authorization." <u>United States v. Bishop</u>, 890 F.2d 212,

216 (10th Cir. 1989) (quoting <u>Leon</u>, 468 U.S. at 923 n.23).  The court considers "all of the

circumstances" when making this determination. <u>Leon</u>, 468 U.S. at 923 n.23.  The government

"bears the burden of proving that its agents' reliance upon the warrant was objectively

reasonable." <u>United States v. Cook</u>, 854 F.2d 371, 373 (10th Cir. 1988) (quoting <u>United States v.</u>

<u>Michaelian</u>, 803 F.2d 1042, 1048 (9th Cir. 1986)).  Still, "[t]he first notion to be remembered in

considering the good faith principle is the presumption created in <u>Leon</u> that when an officer relies

upon a warrant, the officer is acting in good faith." <u>United States v. Cardall</u>, 773 F.2d 1128,

1133 (10th Cir. 1985).

The Supreme Court has identified four situations in which the good faith exception to the

exclusionary rule does not apply.  See id. at 922-23.  The Tenth Circuit has articulated these four

situations as follows:

> First, evidence should be suppressed if the issuing magistrate was misled by an
> affidavit containing false information or information that the affiant would have
> known to be false if not for his reckless disregard of the truth. . . . Second, the
> exception does not apply when the "issuing magistrate wholly abandon[s her]
> judicial role." . . . Third, the good-faith exception does not apply when the
> affidavit in support of the warrant is "so lacking in indicia of probable cause as to
> render official belief in its existence entirely unreasonable." . . . Fourth, the
> exception does not apply when a warrant is so facially deficient that the executing
> officer could not reasonably believe it was valid.

United States v. Danhauer, 229 F.3d 1002, 1007 (10th Cir. 2000) (quoting Leon).

Principally, Mr. Zaldivar contends that the magistrate judge was misled by what he

characterized as a material omission that recklessly disregarded the truth.  As noted above, the

court finds that there was no materially false omission and so the magistrate judge was not

misled.  Similarly, there is no evidence that the magistrate judge abandoned her judicial role

when she issued the search warrant.  And, given the court's analysis above, the warrant was not

"so lacking in indicia of probable cause" or "so facially deficient" to make an officer's belief in

its validity entirely unreasonable.  There is no evidence in the record of any bad faith on the part

of Special Agent Marsee or any other officer executing the warrant.

Even if the affidavit and warrant did not provide probable cause, the search survives

under the Leon good faith exception.  Accordingly, the court denies Mr. Zaldivar's motion to

suppress evidence obtained during the search of the house.

**3.      Mr. Zaldivar Does Not Have Standing to Challenge Search of the Camera.**

Mr. Zaldivar seeks to suppress the photograph taken from the digital camera found in the

Chevrolet Tahoe SUV.  He does not claim that he was the owner or in possession of the digital

camera or the Tahoe.  Rather, he claims that "he had a reasonable expectation of privacy in the

alleged trophy photo and that any standing with respect to the camera would be derivative of the

photograph."  (Def.'s Notice of Clarification in re: Standing (Dkt # 47).)

Mr. Zaldivar testified that his co-defendant Moya-Breton owned the camera and took the

picture that Mr. Zaldivar now seeks to suppress.  Mr. Zaldivar did not object to the taking of the

picture but he asked Mr. Moya-Breton to erase the photograph.  Mr. Moya-Breton said he would

(but, of course, he did not).

Mr. Zaldivar now claims that he "had an arrangement with Moya Breton whereby the

photograph would be destroyed and further, that the photograph would remain private.  This

documents Zaldivar's ability to control the destiny of the photograph and to regulate access to the

photograph."  (Def.'s Mem. Supp. at 12.)  He further contends that his privacy rights in the

photograph were violated when Special Agent Marsee viewed the contents of the digital camera

without a search warrant.

Mr. Zaldivar has the burden to establish standing.  United States v. Allen, 235 F.3d 482,

489 (10th Cir. 2000).  The right to privacy under the Fourth Amendment is a personal right that

cannot be vicariously asserted.  United States v. Allen, 235 F.3d 482, 489 (10th Cir. 2000).

To determine whether standing exists, the court must apply the "classic Fourth

Amendment test: 'whether the defendant manifested a subjective expectation of privacy in the

area searched and whether society is prepared to recognize that expectation as objectively

reasonable.'"  Allen, 235 F.3d at 489 (quoting Erwin, 875 F.2d at 270).  Important considerations

include whether the defendant had lawful ownership, possession, or control of the area searched.

See Rakas v. Illinois, 439 U.S. 128, 143 n.12 (1978).  See also United States v. Erwin, 875 F.2d

268, 270-71 (10th Cir. 1989) ("Although ownership of the item seized is not determinative, it is

an important consideration in determining the existence and extent of a defendant's Fourth

Amendment interests.").

Although Mr. Zaldivar claims he has a subjective expectation of privacy in the

photograph, he has not claimed any expectation of privacy in the camera.  To succeed on his

claim, Mr. Zaldivar must establish that he had the appropriate expectation of privacy in the area

searched, not the evidence gathered from the search.  See, e.g., Allen, 235 F.3d at 489 (focusing

on expectation of privacy in the area searched); Erwin, 875 F.2d at 270 (same).  In this case, the

"area searched" was the camera itself, not the photograph, so Mr. Zaldivar's argument misses the

mark.[7]  See also United States v. Hilton, 619 F.2d 127, 133 (1st Cir. 1980) (holding that

defendants who did not assert any proprietary or possessory interest in camera or film canisters

had no standing to contest search of those items and so could not seek suppression of developed

film); United States v. Blair, 493 F. Supp. 398, 417 (D. Md. 1980) (holding that defendants did

not establish possessory or proprietary interest in film so they lacked standing to challenge

validity of the development of the film).

Mr. Zaldivar has not established a subjective or objective expectation of privacy in the

camera.  Accordingly, he does not have standing to seek suppression of the photograph.[8]

---

[7]The cases cited by Mr. Zaldivar do not support his standing argument.  They are supportive of the government's position, not relevant, or distinguishable because the defendant established a proprietary or possessory interest in the area searched.

[8]Accordingly, the court need not reach the issue of whether Special Agent Marsee's review of the digital photographs on the camera was a valid search.

## ORDER

For the foregoing reasons, the court orders as follows:

1.      Defendant Antonio Zaldivar's Second Amended Motion to Suppress for Illegal Search and Seizure and for Miranda Violation (Dkt # 46) (as supplemented by Notice of Clarification in re: Standing (Dkt # 47)) is DENIED.

2.      Defendant Antonio Zaldivar's Request for a Franks Hearing (Dkt # 53) is DENIED.

DATED this 26th day of March, 2007.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
Chief Judge